IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLIZE MARIE BAKER, §
 §
        Plaintiff, §
 § Civil Action No. 3:15-CV-3679-D
VS. §
 §
AETNA LIFE INSURANCE CO., et al., §
 §
        Defendants. §

MEMORANDUM OPINION
AND ORDER

Plaintiff Charlize Marie Baker ("Baker")—who is undergoing the process of gender transition from male to female—sues defendant Aetna Life Insurance Company ("Aetna"), seeking to recover short-term disability benefits under an ERISA[1]-qualified short-term disability benefits plan ("STD Plan") following breast augmentation surgery. Following a bench hearing, and for the reasons that follow, the court holds that Aetna gave a legally correct interpretation to the STD Plan and did not abuse its discretion in denying Baker's claim. The court therefore enters judgment in favor of Aetna.[2]

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461. Both parties agree that the STD Plan is subject to ERISA.

[2]Baker and Aetna filed cross-motions for partial summary judgment. In a January 13, 2017 order, the court stated that, rather than decide the motions as summary judgment motions, it would conduct a bench hearing based on the summary judgment briefs and administrative record already on file, with oral argument. This decision is rendered following the bench hearing.

I

Baker is an employee of L-3 Communications Integrated Systems, LP ("L-3") and a participant in the company's ERISA-qualified health benefits plan ("Health Plan") and STD Plan. Aetna is the third-party administrator of the Health Plan and the claim fiduciary and administrator of the STD Plan.

In 2011 Baker began the process of gender transition from male to female. Baker was advised during her transition by Feleshia Porter, M.S., L.P.C. ("Porter"), a licensed professional counselor. As part of Baker's gender transition, she underwent hormone replacement therapy, which was covered under the Health Plan. Baker developed size B-C breasts as a result of hormone replacement therapy. In 2015, after consulting with Porter, Baker underwent breast augmentation surgery (i.e., implant surgery). Baker sought benefits from Aetna under the STD Plan for her post-surgery recovery.

In considering Baker's claim, Aetna relied on her medical records, including records from her plastic surgeon, Scott Harris, M.D. ("Dr. Harris"), and Baker's own disclosures in the claim documentation. Dr. Harris' records described the surgery as a breast augmentation. And on the Aetna claim form, Baker answered the question, "What is the primary medical condition that keeps you from working?" with the response, "cosmetic procedure." P. App. 5. Aetna denied Baker's claim on the ground that her surgery was not caused by an illness, injury, or pregnancy-related condition, as required for coverage under the STD plan. Aetna informed Baker by letter and telephone call of the denial. Aetna's letter also informed Baker of her right to appeal the decision, and to submit additional documents and records.

Baker appealed Aetna's initial denial.

Baker submitted two letters in support of her appeal. The first, from Dr. Harris, stated that "[t]his surgery was for a breast reconstruction for her transgender surgery that she was interested in having done. Transgender surgery, as you know, has become a functional indication for surgery." P. App. 83. The second letter, from Porter, stated:

> Charlize Baker has been going through gender transition[.] . . . Therapeutic issues we have addressed include family; self esteem; motivation for physical alterations; and permanent effects of gender transition. In March of this year my client received her first medically necessary surgery. Breast augmentation is considered reconstructive and necessary in body feminization.

*Id.* at 84.

Aetna denied Baker's appeal, once again finding that the surgery did not meet the plan criteria of being medically necessary and due to an illness, injury or pregnancy-related condition. In its letter informing Baker of the appeal decision, Aetna wrote that all information in the claim file had been considered, including the letters from Porter and Dr. Harris. Aetna stated that, although it was aware that Baker had been undergoing gender transition since 2011, Baker had continued working during that time, and the evidence did not establish that her breast augmentation surgery was medically necessary and due to an illness.

Baker filed this lawsuit against Aetna and L-3. In a prior memorandum opinion and order, *Baker v. Aetna Life Ins. Co.*, ___ F.Supp.3d ___, 2017 WL 131658 (N.D. Tex. Jan. 13, 2017) (Fitzwater, J.), the court dismissed Baker's discrimination claim against Aetna and L-3

under § 1557 of the Patient Protection and Affordable Care Act, *id.* at *4; dismissed Baker's alternative ERISA-based discrimination claim, *id.*; dismissed Baker's claim against Aetna for sex/gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, *id.* at *5; and denied L-3's motion to dismiss Baker's Title VII claim, *id.* Baker's ERISA claim (other than the alternative discrimination claim) against Aetna and her Title VII claim against L-3 remain for adjudication. *Id.* The court today addresses Baker's ERISA claim against Aetna.

II

An ERISA plan participant who is denied benefits can sue to recover them. *See* 29 U.S.C. § 1132(a)(1)(B). This court has jurisdiction to review determinations made by an ERISA employee benefit plan. *See, e.g., Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 119 (2008). In conducting this review, the

> plan administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect, and if there is such then review of these decisions is also for abuse of discretion.

*Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). In this case, the parties agree that the STD Plan grants Aetna discretionary authority to construe the plan's terms. Accordingly, review of Aetna's construction of the meaning of plan terms or plan benefit entitlement provisions is for abuse of discretion. *See id.*

In cases where discretion is given to ERISA plan administrators, a district court employs a two-step process to evaluate the interpretation of the terms of the plan. "First, it determines whether the administrator gave the Plan a legally correct interpretation. Second, it decides whether the incorrect decision constitutes an abuse of discretion." *Krusos v. Atl. Richfield Co.*, 2003 WL 21383656, at *5 (N.D. Tex. June 11, 2003) (Fitzwater, J.). The first inquiry—whether Aetna's interpretation of the STD Plan was legally correct—considers three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992). If "the fiduciary's interpretation of the plan was legally correct, the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 270 (5th Cir. 2004). "If the determination was legally correct, there is no abuse of discretion; if it was incorrect, then [the court] must review whether that interpretation was an abuse of discretion." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 n.2 (5th Cir. 2009).

Assuming that the plan administrator's interpretation of the terms is incorrect, the court then turns to the question of abuse of discretion. "Three factors are important in this analysis: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Wildbur*,

974 F.2d at 638.

The court will reverse Aetna's factual determinations only if the decision is not rational or supported by substantial evidence in the record. *See, e.g., Green v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 1999 WL 417925, at *2 (N.D. Tex. June 22, 1999) (Fitzwater, J.). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland*, 576 F.3d at 246 (internal quotation marks omitted). "'[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.'" *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 140 (5th Cir. 2016) (quoting *Vega*, 188 F.3d at 297).

Finally, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (brackets and internal quotation marks omitted). A conflict of interest does not alter the standard of review. *Holland*, 576 F.3d at 247. Rather, "'conflicts are but one factor among many that a reviewing judge must take into account.'" *Id.* at 247-48 (quoting *Glenn*, 554 U.S. at 116). A conflict

> should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps

> to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S at 117 (citation omitted).

III

Baker appears to challenge both Aetna's interpretation of the STD Plan and its factual determination of her claim. The court first turns to whether Aetna's interpretation of the STD Plan was legally correct.

A

The STD Plan provides, in relevant part: "Short term disability coverage will pay a weekly benefit if you are disabled and unable to work because of: An illness that is a non-occupational illness; An injury that is a non-occupational injury; or A disabling pregnancy-related condition." P. App. 307. The STD Plan also defines "illness" to mean "[a] pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to it and that sets the condition apart as an abnormal entity differing from other normal or pathological body states." *Id.*

B

The first factor considered in determining whether an interpretation is legally correct is "whether the administrator has given the plan a uniform construction." *Wildbur*, 974 F.2d at 638. This factor asks whether the administrator "consistently appl[ies] the Plan to

similarly situated applicants." *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 258 (5th Cir. 2009).

Baker contends that Aetna lacks a uniform construction for when to cover breast implants. First, she posits that Aetna covers breast reconstruction following mastectomy, lumpectomy, or trauma, but not for Gender Dysphoria, as in this case. Baker maintains that this interpretation is not internally consistent, because in each instance specified, the breast surgery is medically necessary. Second, Baker contends that Aetna covers breast reduction for transgender insureds who are transitioning from female to male, but not, in this case, breast augmentation for someone transitioning from male to female.

Aetna responds that different facts, not inconsistent plan constructions, explain why other breast surgeries may have been covered but Baker's was not. Aetna maintains that Baker's claim was denied, not because of any categorical rule about Gender Dysphoria or male-to-female transitions, but because Baker did not establish that breast augmentation surgery was medically necessary to treat her specific case of Gender Dysphoria. Aetna contends that Baker's surgery was not covered because she had already developed average-size female breasts from hormone replacement therapy, making breast augmentation surgery unnecessary. As for the difference in treatment between male-to-female and female-to-male transitions, Aetna maintains that hormone replacement therapy—a non-surgical regimen—enables a male transitioning to a female to grow breasts, but that there is no similar alternative for a female transitioning to a male, who is seeking a reduction in breast size.

The court concludes that the uniform construction factor is neutral, because the court

cannot determine from the administrative record that Aetna has confronted this situation before. Baker does not point to similar claims that were treated differently; none of her examples presents the issue of whether to cover a breast reconstruction on which progress has already been made by non-surgical means. *See Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998) (holding that "uniform construction" element was neutral because administrator had not previously interpreted plan in light of similar claim).

C

Baker does not address the second and third *Wildbur* factors—whether the interpretation is consistent with a fair reading of the plan, and whether unanticipated costs would result from a different interpretation. *See Wildbur*, 974 F.2d at 638. Baker's unfairness argument is actually about uniform construction, not about a fair reading of the plan, and is included in the analysis above. *See Ellis*, 394 F.3d at 271 (explaining that "fair reading of the plan" considers whether interpretation is consistent with language of plan). And Baker's bad faith contention has no application until Aetna's interpretation is held to be legally incorrect, and an abuse of discretion analysis becomes necessary. *See Wildbur*, 974 F.2d at 638. Aetna likewise does not address the second and third factors.

The court concludes that the second and third factors favor Aetna's interpretation. The plain language of the STD Plan entitles a participant to benefits if she is "disabled and unable to work because of: An illness[.]" P. App. 307. Aetna's interpretation, as discernible from its handling of Baker's claim, is that disability "because of" an illness includes disability resulting from a surgery that was necessary to treat an illness, but excludes

disability resulting from a surgery that was only cosmetic. This interpretation is consistent with a fair reading of the STD Plan. *See Ellis*, 394 F.3d at 271. And any other interpretation would be likely to produce costs that Aetna could not reasonably have anticipated by requiring it to cover cosmetic procedures unrelated to illness. *See Tolson*, 141 F.3d at 609.

D

Considering all three factors, the court concludes that Aetna gave a legally correct interpretation to the STD Plan. The uniform construction factor is neutral, and the other two factors—whether the interpretation is consistent with a fair reading of the plan, and whether unanticipated costs would result from a different interpretation—favor Aetna's interpretation. *See Wildbur*, 974 F.2d at 638. Accordingly, the court holds that Aetna's interpretation was legally correct, and there is no need to analyze whether Aetna abused its discretion when interpreting the STD Plan.

IV

The court now turns to the question whether Aetna's factual determination was an abuse of discretion.

A

Baker contends that, because Gender Dysphoria is an illness that necessitated her breast augmentation surgery, she is entitled to benefits under the STD Plan to cover her post-surgery recovery. She maintains that recognized standards, such as the World Professional Association for Transgender Health ("WPATH") standards of care, provide that breast augmentation surgery is a medically necessary—not elective—treatment for Gender

Dysphoria; that Aetna abused its discretion by failing to credit evidence from her treating medical professionals that showed that her surgery was necessary to treat her Gender Dysphoria; that the letter from Dr. Harris, her plastic surgeon, demonstrated necessity when it stated that "[t]ransgender surgery" was a functional indication for the breast augmentation surgery, P. App. 83; and that the letter from Porter, her mental health professional, states that breast augmentation surgery was medically necessary in Baker's case, and Aetna did not cite any medical opinions to contradict this evidence.

Baker maintains that the denial of her claim was not based on substantial evidence, because Aetna can point to no medical opinion contradicting Porter's opinion that breast augmentation was medically necessary; that Dr. Harris' opinion, to the extent it addresses medical necessity, should receive little weight, because as a surgeon, he is not normally expected to determine what treatments are medically necessary to treat Gender Dysphoria; that in deciding her appeal, Aetna was obligated under ERISA's implementing regulations to consult with a health care professional and provide an explanation of its decision, *see* 29 C.F.R. §§ 2560.503-1(g)(1)(v)(B), 2560.503-1(h)(3)(iii); *see also Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 156-57 (5th Cir. 2009) (holding that plan administrator failed to comply with ERISA's procedural requirements); and that Aetna failed to meet both of these requirements.

Aetna agrees that Gender Dysphoria is an illness, but it disagrees that breast augmentation surgery was necessary to treat an illness in Baker's case. Aetna contends that hormone replacement therapy had already caused Baker to develop average-size female

breasts, and surgery to further increase her breast size was therefore cosmetic and not a necessary treatment for her illness; that Baker's medical records support its decision; that Baker described the surgery as a "cosmetic procedure" in her initial claim, P. App. 5, and no subsequent evidence disproved this description; that Dr. Harris twice coded the surgery simply as a breast augmentation in records submitted to Aetna; and that, in Dr. Harris' letter in support of Baker's appeal, he expressed no opinion on whether the surgery was necessary to treat Gender Dysphoria, but instead described the procedure as something that Baker "was interested in having done," P. App. 83.

As for Porter's letter, Aetna contends that it is too conclusory to establish that the surgery was necessary to treat Baker's illness; that Baker's complete medical records contradict Porter's opinion, because Dr. Harris' pre-operative examination report shows that Baker had already developed significant breast tissue (size B-C) prior to surgery; and that the WPATH standards that Baker cites support Aetna's position, because they state that opinions diverge as to whether breast augmentation in a gender transition should be considered cosmetic.

Aetna maintains that objective medical evidence in Baker's records establishes that breast augmentation was cosmetic in her case. It characterizes Porter's opinion as conclusory and at odds with Baker's medical records, specifically with the fact that Baker had already developed the same breast size as an average American female. Aetna notes that at least one court has recognized the distinction between necessary treatment and cosmetic enhancement as it relates to breast augmentation surgery for transgender females who have had hormone

replacement therapy. *See O'Donnabhain v. Comm'r*, 134 T.C. 34, 73 (2010). And Aetna cites cases that held that breast reduction surgeries were cosmetic, even when they were said to be necessary for alleviating back pain. *See, e.g.*, *Fallon v. Fortis Health*, 2006 WL 148903, at *14 (S.D. Tex. Jan. 18, 2006).

B

The court concludes that Aetna did not abuse its discretion in denying Baker's claim under the STD Plan. Aetna's initial claim determination was based on Baker's own description of the surgery as a "cosmetic procedure," P. App. 5, and Dr. Harris' coding of the surgery as a breast augmentation. Aetna's initial decision was therefore supported by substantial evidence. *See Holland*, 576 F.3d at 246

Nor did Aetna abuse its discretion in denying Baker's appeal. After advising Baker that it had denied her claim, Aetna invited Baker to submit additional records and documentation supporting her position. In response, Baker submitted a letter from Porter that was brief and conclusory and did not give reasons for Porter's conclusion that the surgery was necessary to treat Baker's illness. Other evidence in the record, such as the pre-operative examination report by Dr. Harris, indicated that Baker already had size B-C breasts, and supports Aetna's determination that Baker's breast augmentation surgery was cosmetic. *Cf. O'Donnabhain*, 134 T.C. at 73 (holding that breast augmentation surgery was cosmetic for transgender woman with significant hormone-induced breast development).

Although Baker contends that Aetna was incorrect to rely on this evidence instead of Porter's professional opinion, she cites no controlling authority that requires an administrator

to prefer opinion evidence—in this case from a non-physician—over other evidence in the record, particularly considering the conclusory nature of Porter's letter. *See Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 517 (5th Cir. 2010) (holding that insurer did not abuse its discretion by disregarding doctors' conclusory opinion letters). In summary, Aetna's decision on the appeal was "based on evidence, even if disputable, that clearly supports the basis for its denial." *Holland*, 576 F.3d at 246 (internal quotation marks omitted).[3]

Finally, Aetna's structural conflict of interest is not a significant factor in the abuse of discretion analysis because Aetna has provided evidence of its extensive procedural safeguards intended to reduce the risk of bias, and Baker has submitted no evidence that the structural conflict affected Aetna's decision. *See Holland*, 576 F.3d at 249. And although procedural irregularities such as those that Baker alleges may inform the weight given to a conflict of interest, in this case Aetna's claim process is so thoroughly screened against bias that the conflict remains insufficient to establish that Aetna abused its discretion. *See Burell*, 820 F.3d at 139.

---

[3]The ERISA implementing regulations that Baker cites, including the requirement that the administrator consult with a healthcare professional when denial of an appeal is based on a medical judgment, only control in a "full and fair review" or "procedural irregularity" claim—not an abuse of discretion analysis. *See Rossi v. Precision Drilling Oilfield Servs. Corp. Emp. Benefits Plan*, 704 F.3d 362, 366 (5th Cir. 2013) (holding that procedural irregularity claim must be raised in the complaint); *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 538 (5th Cir. 2007) (holding that existence of procedural irregularity does not change abuse of discretion standard), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010).

\* \* \*

Accordingly, because the court holds that Aetna gave a legally correct interpretation to the STD Plan and did not abuse its discretion in denying Baker's claim, it enters judgment in favor of Aetna on Baker's ERISA claim.

**SO ORDERED**.

May 9, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE